# EXHIBIT C

**EXHIBIT B.1**

# A CORP.

# ROOTER-MAN FRANCHISE AGREEMENT

FA 4/18 – Copyright © 2000-2018 A CORP.  All rights reserved.

TABLE OF CONTENTS

ITEMS                                                                          PAGE
A CORP FRANCHISE AGREEMENT                                                        1
1. FUNDAMENTAL FRANCHISE AGREEMENT PROVISIONS ..................................  2
    1.1  Date of Franchise Agreement .....................................................  2
    1.2  Parties ...........................................................................  2
    1.3  Licensed Territory ...............................................................  2
    1.4  Total Population .................................................................  2
    1.5  Commencement Date .............................................................  2
    1.6  Expiration Date...................................................................  2
    1.7  Initial Franchise Fee ............................................................  2
    1.8  Licensed Businesses .............................................................  2
    1.9  Continuing Royalty .............................................................  2
    1.10 Advertising Contribution .......................................................  2
    1.11 Renewal Fee ...................................................................  2
    1.12 Transfer Fee ...................................................................  2
    1.13 Active Owners .................................................................  2
    1.14 Franchise Termination Fee .....................................................  2

2. GRANT OF FRANCHISE ....................................................................  3
    2.1  Grant ...........................................................................  3
    2.2  Limited License .................................................................  3

3. LICENSED TERRITORY ...................................................................  3
    3.1  Territory Defined ...............................................................  3
    3.2  Interterritorial Policy ...........................................................  3
    3.3  Rights Retained .................................................................  3

4. TERM OF FRANCHISE AGREEMENT, RENEWAL OPTION ...........................  4
    4.1  Term ...........................................................................  4
    4.2  Renewal .......................................................................  4
    4.3  Notice Required by Law .......................................................  4

5. FRANCHISE FEE AND CONTINUING ROYALTY ...............................  5
    5.1  Initial Fee .......................................................................  5
    5.2  Continuing Royalty .............................................................  5

6. FRANCHISE SYSTEM MARKETING MATERIAL FUND ...........................  5
    6.1  Contribution by Franchisee .....................................................  5
    6.2  Advertising Report .............................................................  5

7. FRANCHISEE ADVERTISING, PROMOTION AND IDENTIFICATION .................  5
    7.1  Local Advertising ...............................................................  5
    7.2  Interterritorial Advertising .....................................................  6
    7.3  Display...........................................................................  7
    7.4  Identity as Franchisee ..........................................................  7
    7.5  Sale of Franchise ...............................................................  7

8. TRADEMARKS ...........................................................................  7
    8.1  Grant of License .................................................................  7

FA 4/18 – Copyright © 2000-2018 A CORP.  All rights reserved.

8.2   Name of Business ........................................................................   7
8.3   No Other Names ..........................................................................   7
8.4   Change of the Trademarks ...........................................................   8
8.5   Trademark Prosecution ...............................................................   8

9.   TRAINING AND OPERATING ASSISTANCE ....................................   8
9.1   Initial Training Program ..............................................................   8
      A. The Program ............................................................................   8
      B. Expenses .................................................................................   8
      C. Waiver ....................................................................................   8
9.2   Staff Training ...............................................................................   8
9.3   Additional Assistance ..................................................................   9
      A. Operating Manual ....................................................................   9
      B. Grand Opening Promotional Program ......................................   9
      C. Advertising Materials ..............................................................   9
      D. Seminars .................................................................................   9
      E. On-Going Assistance and Supervision .....................................   9
      F. Initial Sales Assistance ............................................................   9
      G. Product Offerings ....................................................................   9

10.  FRANCHISE OFFICE LOCATION .....................................................   9

11.  VEHICLES, EQUIPMENT AND SUPPLIES .........................................  10
     11.1  Vehicles ...............................................................................  10
     11.2  Equipment ...........................................................................  10
     11.3  Uniforms .............................................................................  10

12.  OPERATION of the FRANCHISE ......................................................  10
     12.1  Operations Manual ...............................................................  10
           A. Incorporation of Operations Manual ...............................  10
           B. Confidentiality of Operations Manual .............................  10
           C. Modifications ..................................................................  11
     12.2  Hours of Operation ..............................................................  11
     12.3  Resolution of Customer Problems ........................................  11
     12.4  Cleaning and other Supplies ................................................  11
     12.5  Franchise Management .........................................................  11
     12.6  Insurance .............................................................................  11
           A. Notice .............................................................................  12
           B. Insurance and Step-In-Rights ..........................................  12
     12.7  Bookkeeping Standards ........................................................  12
     12.8  Franchisor Inspection ..........................................................  12
     12.9  Compliance with Law ..........................................................  12
     12.10 No Suggested Service Fees ..................................................  12
     12.11 Franchise Telephone Service and Directory Listings ...........  12

13.  RECORDS .........................................................................................  13
13.1  Sales Records and Tax Returns ....................................................  13
13.2  Periodic Reports ..........................................................................  13
13.3  Additional Recording Systems ....................................................  13
13.4  Inspection and Audit ...................................................................  13

FA 4/18 – Copyright © 2000-2018 A CORP.  All rights reserved.

**14. ASSIGNMENT AND RIGHT OF FIRST REFUSAL** ...................................... 14
    14.1 Assignment by A CORP ...................................................... 14
    14.2 Assignment by Franchisee ................................................. 14
        A. Permitted Transfers ................................................ 14
        B. Transfer Upon Death or Permanent Incapacity .................... 15
        C. Transfer to Franchisee's Corporation .......................... 15
        D. Non-Waiver of Claims ............................................ 16

**15. DEFAULT AND TERMINATION** ...................................................... 16
    15.1 Immediate Termination .................................................. 16
    15.2 Termination with Notice ............................................... 17
    15.3 Conformity with Law .................................................... 18
    15.4 Cross Default .......................................................... 18
    15.5 Franchise Termination Option ........................................... 18

**16. RIGHTS AND DUTIES OF PARTIES UPON EXPIRATION OR TERMINATION** ...... 19

**17. STEP-IN-RIGHTS** ................................................................ 20
    17.1 Cause for Step-In ...................................................... 20
    17.2 Duties of Parties ...................................................... 20

**18. NON-COMPETITION AND NON-DISCLOSURE COVENANTS** ......................... 20
    18.1 Non-Competition ........................................................ 20
    18.2 Non-Disclosure ......................................................... 20

**19. GENERAL CONDITIONS AND PROVISIONS** ...................................... 21
    19.1 Titles for Convenience ................................................. 21
    19.2 Entire Agreement ....................................................... 21
    19.3 Amendment in Writing ................................................... 21
    19.4 Relationship ........................................................... 21
    19.5 No Waiver .............................................................. 21
    19.6 Governing Law .......................................................... 22
    19.7 Mediation and Arbitration .............................................. 22
    19.8 Notices ................................................................ 23
    19.9 Indemnification ........................................................ 24
    19.10 Limitation of Liability of A CORP ..................................... 24
    19.11 Late Payment Fees ..................................................... 24
    19.12 Survival of Covenants ................................................. 24

**20. CAVEAT** ...................................................................... 24

**21. RELEASE** ..................................................................... 25

**APPENDIX 1 – LICENSED TERRITORY** ............................................... 27
**EXHIBIT A – GUARANTY OF PERFORMANCE** ........................................... 28
**EXHIBIT B – POWER OF ATTORNEY** ................................................. 29
**EXHIBIT C – PROMISSORY NOTE** ................................................... 30
**EXHIBIT D – WAIVER OF TRAINING PROGRAM PARTICIPATION** .......................... 31
**EXHIBIT E – AUTHORIZATION TO CHARGE CREDIT CARD OR CHECKING ACCOUNT** ..... 32

FA 4/18 – Copyright © 2000-2018 A CORP. All rights reserved.

**A CORP.**
**FRANCHISE AGREEMENT**

**AGREEMENT** entered into this **30th** day of **July, 2018**, by and between:

**A CORP.**
a Massachusetts Corporation
268 Rangeway Road
Box 290
North Billerica, MA  01862
("A CORP.")

and

**Finish Connection**
**30010 S. Macarthur Dr.**
**Tracy, CA 95377**

_____

**("FRANCHISEE")**

**WHEREAS:**

A CORP. has developed and is continuing to develop certain unique training, marketing and management methods relating to various service industries which offer services to the public through a franchise system (the " A CORP. System ") as it evolves from time to time; and

A CORP. has successfully established a reputation, demand and goodwill for its System under various registered names and marks which A CORP. owns, including without limitation, **Rooter-Man, Rooter-Man to the Rescue, Rotor-Man** and such other valuable trade names, service marks, trademarks, logotypes and designs (the "Trademarks") which A CORP. may develop and license for use through the A CORP. System; and

A CORP.'s trademarks and methods of operations and other business practices and policies relating to the operation of the A CORP. System (collectively the "Business System") constitute confidential and valuable trade secrets; and

**FRANCHISEE** desires to enter into the business of operating an A CORP. franchise utilizing some or all the Trademarks, the Business System and all advantages of the A CORP. System franchise program upon the terms and conditions contained in this agreement.

**THEREFORE**, in consideration of the mutual agreements, covenants and promises contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree to be bound legally as follows:

## 1.    FUNDAMENTAL FRANCHISE AGREEMENT PROVISIONS

1.1    **Date of Franchise Agreement**:          July 30, 2018

1.2    **Parties**:      **FRANCHISOR:**          **FRANCHISEE:**
                      A CORP.                   Finish Connection
                      268 Rangeway Road         30010 S. Macarthur Dr
                      N. Billerica, Ma  01862   Tracy. CA 95377

1.3    **Licensed Territory**:          Defined in the attached Appendix 1

1.4    **Total Population**:            303,223

1.5    **Commencement Date**:          July 30, 2018

1.6    **Expiration Date**:            July 30, 2023

1.7    **Initial License Fee**:        $3,975.00[1]
                                        ($31.80 per thousand of population)

1.8    **Businesses Licensed (By Trademark)**:    **Rooter-Man**
                                                    **Rooter-Man to the Rescue**
                                                    **Rotor-Man**

1.9    **Continuing Royalty**:          $330.00 per month.
                                        ($0.88 per  thousand of population)

1.10   **Marketing Fund Contribution**:    $45.00 per month.
                                            ($ .12 per thousand of population monthly)

1.10.1 **Locally Optimized Website**      $89.00 per month

1.11   **Franchise Renewal Fee**:        $2500.00

1.12   **Transfer Fee**:                 Greater of 5% of Franchise Selling
                                          Price or $2,500.00

1.13   **Active Owners**:                Mike Mehenni

---

[1] A Corp is offering existing and new franchisees a special offer to purchase that if they purchase two (2) units of 125,000 population, they will receive the third unit for free.  The $125.00 monthly fee will still apply to each of the three units.

**2.1** **GRANT.** **A CORP.** hereby grants to **FRANCHISEE**, and **FRANCHISEE** hereby accepts, a license to conduct the business listed in Section 1.8 (the "**A CORP.** System Franchise") for the term described below, according to the provisions of this Agreement and any related agreements.

**2.2** **LIMITED LICENSE.** This franchise is a limited grant of rights. Upon termination for any reason or upon expiration of this Agreement, all rights of **FRANCHISEE** to operate the A **CORP.** System franchise shall cease and the license set forth above shall terminate.

## 3. LICENSED TERRITORY

**3.1** **TERRITORY DEFINED**

A. The franchise granted by this Agreement to operate the **A CORP.** System franchise shall be within the Territory set forth in Section 1.3 (the "Territory"). **FRANCHISEE** shall offer the services of the **A CORP.** System franchise **only** in the Territory.

B. **FRANCHISEE** agrees to diligently, faithfully and in a business like manner, promote, market and conduct the franchised business within the Territory so as to fully develop and maximize the business potential of the Territory and shall devote **FRANCHISEE's** full time, attention and best efforts to achieve that end. **FRANCHISEE's** failure to do so shall be deemed a material breach of this Agreement as specified in Section 15.2.

C. **FRANCHISEE** shall not engage in marketing activities or solicitation of business outside the Territory. In order for **FRANCHISEE** to engage in such activities within an unlicensed territory, **FRANCHISEE** must execute a separate Franchise Agreement and pay an additional franchise fee.

D. **FRANCHISEE** shall establish and maintain an office within the Territory to conduct his or her franchise. **FRANCHISEE** shall not establish an office outside of the Territory.

E. **A CORP.** agrees that during the term it will not license any other person or entity to operate the same **A CORP.** system franchise in the Territory, and will not itself establish the same A **CORP.** system franchise in the Territory.

**3.2** **INTERTERRITORIAL POLICY.** **A CORP.** shall have the right to adopt and implement policies and procedures prohibiting or strictly limiting **FRANCHISEE's** conduct and solicitation of business and marketing activities outside the Territory. With the exception of interterritorial advertising, as described in Section 7.2 of this Agreement, **FRANCHISEE** is prohibited from advertising, soliciting or maintaining a business phone number or office outside of the Territory.

**3.3** **RIGHTS RETAINED.** Notwithstanding Section 3.2, **A CORP.** shall, however, have the right to:  a) refer work to other franchisees, to itself, its parent, subsidiary or affiliated companies or to unaffiliated subcontractors, whether within or outside of the Territory, which **FRANCHISEE** is not licensed, not equipped or not expressly authorized to render; and  b) sell, rent or authorize others to sell or rent, drain cleaning, products, and equipment, or render services which are not the subject of this Agreement within or outside of the Territory.

## 4. TERM OF FRANCHISE AGREEMENT AND RENEWAL OPTION

**4.1    TERM.**   The term of this Franchise Agreement shall be 5 years from the date of execution of this Agreement, unless terminated sooner for a reason set forth in Section 15. At the expiration of this term, **FRANCHISEE** may exercise the Renewal Option set forth in Section 4.2.

**4.2    RENEWAL.**   **FRANCHISEE** shall have the option to renew this franchise for additional 10 year terms subject to the following conditions:

**A. FRANCHISEE** shall give **A CORP.** written notice of his or her desire to exercise the option to continue as a franchisee no later than 6 months prior to the expiration of the initial term of this Agreement and each renewal term.

**A CORP.** shall furnish **FRANCHISEE** with a copy of **A CORP.**'s then current Franchise Agreement (and related agreements), which Agreement **FRANCHISEE** must execute no later than 3 months prior to the expiration of this Agreement. The Renewal Franchise Agreement shall not include an Initial License Fee but may include an increase in the Continuing Royalty and Marketing Contribution. Such increase, if any, shall be calculated by multiplying the current fee by the percentage change in the Consumer Price Index (hereinafter, "Change In CPI") if any. The Change In CPI shall be calculated using the formula set forth in Section 4.2 B.

**B. A CORP.** shall calculate the Change In CPI by creating a fraction, the numerator of which is the Consumer Price Index for December of the most recently completed year and the denominator of which is the Consumer Price Index for December of the year in which the Franchise Agreement became effective.

The fraction will then be determined by dividing the numerator by the denominator. If the fraction is less than or equal to 1, then no change in fees will occur. If the fraction is greater than 1 (a "CPI Increase"), then a Change In CPI shall have occurred in the amount of the CPI Increase.

**C. FRANCHISEE** shall pay to **A CORP.** upon execution of the renewal Franchise Agreement, the Renewal Fee set forth in Section 1.11.

**D.** Notwithstanding the foregoing, **FRANCHISEE** shall not have the right to exercise the Renewal Option unless **FRANCHISEE** has paid in full all monies then currently due to **A CORP.**, and no other default under the terms of this Agreement exists uncured. **A CORP.** may elect to revoke the renewal option if **FRANCHISEE** shall have received 3 or more notices of default within any 12 month period during the initial term of this Agreement.

**E.** As a condition to this renewal, **FRANCHISEE** shall be required to maintain the services that he is licensed for and to invest in the proper equipment or vehicles to provide those licensed services.

**4.3    NOTICE REQUIRED BY LAW.**  If applicable law requires that **A CORP.** give notice to **FRANCHISEE** prior to the expiration of the initial term, then the Franchise Agreement shall remain in effect on a month to month basis until **A CORP.** has given **FRANCHISEE** the notice required by applicable law.

## 5.   INITIAL LICENSE FEE AND CONTINUING ROYALTY

5.1 **INITIAL FEE. FRANCHISEE**, upon execution of this Agreement, shall pay to **A CORP.** the Initial License Fee set forth in Section 1.7. **FRANCHISEE** acknowledges that the sole consideration for such fee is the grant of the franchise. Such fee shall be fully earned upon execution of this Agreement and shall not be refunded or forgiven.

5.2 **CONTINUING ROYALTY. FRANCHISEE** shall pay to **A CORP.** each month the Continuing Royalty set forth in Section 1.9, subject to a $110.00 per unit each month. **FRANCHISEE** shall also pay to **A CORP.** each month the marketing fund contribution in the amount of $15.00 per unit. The Continuing Royalty will commence thirty (30) days after the execution of the Franchise Agreement. When **A CORP.** adopts an electronic funds transfer program, all Continuing Royalty payments shall be made by electronic funds transfer, pursuant to the program established and amended from time to time by **A CORP.** Each payment shall be accompanied by the financial reports specified in Section 13.2.

## 6. FRANCHISE SYSTEM MARKETING MATERIALS FUND

6.1 **CONTRIBUTION BY FRANCHISEE. FRANCHISEE** agrees to pay to **A CORP.** the Marketing Fund Contribution set forth in Section 1.10 for the design of marketing materials. **FRANCHISEE** shall pay such Marketing Fund Contribution in the same manner specified in Section 5.2. **A CORP.** shall have the sole right to determine how to expend these funds, and shall expend all Marketing Materials funds collected. All monies collected from **FRANCHISEE** pursuant to this Section shall be placed in a separate account.

6.2 **MARKETING MATERIALS FUND REPORT. A CORP.** shall furnish to **FRANCHISEE** within 90 days of each calendar year end, a Fund financial report for the preceding year, prepared and certified to be correct by an officer of **A CORP.**, setting forth the funds collected and the expenditures made during such calendar year.

## 7. FRANCHISEE ADVERTISING, PROMOTION AND IDENTIFICATION

7.1 **LOCAL ADVERTISING. FRANCHISEE** acknowledges that advertising and promotion represents the major source of new clientele for the **A CORP.** System franchise and a major expense of the franchise operation. **FRANCHISEE** shall formulate and effect local advertising and promotion subject to the format, content and media designations contained in the Operations Manual.

A. **FRANCHISEE** shall list itself in those telephone directories which are usually and customarily distributed in the Licensed Territory, under the appropriate headings, as designated by **A CORP. FRANCHISEE** shall not place advertisements or listings in telephone directories which are usually and customarily distributed only outside of the Licensed Territory. **FRANCHISEE** shall expend a minimum of 15% of the franchise's Gross Revenues on local advertising, which advertising will include yellow page listings, local newspaper advertising, marketing and sales materials and the Marketing Fund Contribution. For the purposes of this Agreement, the term "Gross Revenues" shall mean all revenues generated by **FRANCHISEE's** business conducted upon, from, or with respect to **FRANCHISEE's** franchise, whether such sales are evidenced by cash, check, credit, charge account or exchange. Gross Revenues shall include, without limitation, monies or credit received, for services, from the sale of products, from tangible property of every kind and

nature, promotional or otherwise, and for other services performed by **FRANCHISEE** in accordance with the Business System. Gross Revenues shall not include sales or service taxes or municipal or private disposal fees.

**B.** **FRANCHISEE** understands and acknowledges that local and telephone directory advertising and internet advertising are the major sources of new clientele. At the end of the calendar year, **FRANCHISEE** must furnish proof to the **A CORP.** of all local advertising expenditures and copies of all advertisement used during that year ended. A CORP provides free listing of FRANCHISEE through A CORP.'s franchisor website at www.rooterman.com (the "Franchisor Website"). If FRANCHISEE desires to have a local optimized website to promote the System using ACORP.'S Trademarks, FRANCHISEE must use the internet advertisement services provided through the "Franchisor Website". Upon FRANCHISEE's purchase of the A CORP System Franchise, A CORP shall design certain website pages linked to the Franchisor Website with FRANCHISEE's information (the "FRANCHISEE Webpages") and shall activate the FRANCHISEE Webpages in a timely manner. To maintain the consistency of the brand image of A CORP, FRANCHISEE is not allowed to independently design, develop, and maintain any other locally optimized website or register any domain name using A CORP's trademarks.

**C.** **FRANCHISEE** agrees to advertise and promote actively and continuously the System and the Trademarks within the Licensed Territory. **A CORP.** reserves the right to direct **FRANCHISEE** to modify or discontinue advertisements that **A CORP.** believes to present a risk of misleading prospective customers as to the authorized services which **FRANCHISEE** can offer or to the territory in which **FRANCHISEE** can operate. **FRANCHISEE** shall promptly comply with any such directive.

**7.2** **INTERTERRITORIAL ADVERTISING.** In areas (the "Region") where advertising media reach prospective clientele in more than 1 licensed territory, the franchisees operating in this Region may enter into an interterritorial advertising agreement (the "Interterritorial Agreement"). Such Interterritorial Agreements shall provide for the following:

**A.** Advertising fees shall be shared by participating franchisees based upon the percentage of the Region's population that falls within each individual franchisee's Territory. The failure of **FRANCHISEE** to pay his pro rata share under an agreed-upon program shall be considered a default under this Franchise Agreement.

**B.** The format, content and media designations chosen by the participating franchisees for use in the Region shall conform to those requirements specified by **A CORP.** in the Operations Manual; and

**C.** **FRANCHISEE** shall indemnify **A CORP.** from and against any and all claims, demands, losses, damages (including punitive damages), costs, suits, judgments, penalties, expenses and liabilities of any kind or nature arising directly or indirectly out of or in connection with the operation of the Interterritorial Agreement.

**D.** Local advertising shall be FRANCHSIEE's sole responsibility and FRANCHISEE shall not list A CORP. as a party of its local advertising agreement or as list A CORP. under any billing information.

**7.3** **DISPLAY.** **FRANCHISEE** acknowledges that vehicle advertising is an important source

for promotion of the Trademarks and shall maintain all vehicles displaying such Trademarks in accordance with the standards established from time to time by **A CORP. FRANCHISEE** agrees to display prominently at all times on all of **FRANCHISEE's** vehicles such advertising and signage as shall be specified from time to time in the Operations Manual or in operating and marketing memoranda furnished by **A CORP.**

7.4    **IDENTITY AS FRANCHISEE.  FRANCHISEE** agrees that at all times and in all advertising, promotions, signage and other display materials, on its letterheads, business forms, and in all of **FRANCHISEE's** business dealings and to the general public, **FRANCHISEE** will identify himself only as an **A CORP.** System franchisee utilizing only the Trademarks licensed by this Agreement.  **FRANCHISEE** further agrees that **FRANCHISEE** shall not identify himself as being **A CORP.**, a subsidiary, division, partner, joint venturer, agent or employee of **A CORP.** or of any other of **A CORP.'s** franchisees.

7.5    **SALE OF FRANCHISE.**  In the event that **FRANCHISEE** places advertising seeking a buyer for all or part of **FRANCHISEE's** franchise, **FRANCHISEE** shall not include nor allow use of any of the Trademarks to appear in such advertisement.  **FRANCHISEE** may, however, describe the business in general generic terms.  **FRANCHISEE** agrees to enforce this restriction on the activities of the **FRANCHISEE's** sales agent, broker or representative. In addition, the **FRANCHISEE** shall comply with the provisions of Section 14.2.

## 8.  TRADEMARKS

8.1    **GRANT OF LICENSE.  A CORP.** hereby grants to **FRANCHISEE** the right during the term of this Agreement to use and display the Trademarks, set forth in Section 1.8, in accordance with this Agreement and the Operations Manual.  **FRANCHISEE** acknowledges that the Trademarks which have been licensed exclusively by **A CORP.** are valid, and that valuable goodwill is attached to such Trademarks.  All goodwill associated with the Trademarks, including the goodwill generated by **FRANCHISEE** and all other franchisees while conducting business under the Trademarks, is and shall remain the property of    **A CORP. FRANCHISEE** expressly agrees during the term of this Agreement and following the Agreement's expiration or termination, that **FRANCHISEE** shall not directly or indirectly contest or aid in contesting the validity or ownership of the Trademarks. **FRANCHISEE** shall not modify or use the Trademarks in any fashion, including without limitation on products, tools or supplies, unless authorized in a prior writing by **A CORP. FRANCHISEE** shall not file for or acquire any state, federal or international registration of the Trademarks or any trademark or service mark (or variation thereof) which is confusingly similar to the Trademarks.

8.2    **NAME OF BUSINESS.**  If **FRANCHISEE** operates the franchise business through a corporation, **FRANCHISEE** shall not use the Trademarks, or any similar names, in its corporate name.  Upon expiration or termination of this Agreement,  **A CORP.** may, if **FRANCHISEE** does not do so, execute in **FRANCHISEE's** name and on **FRANCHISEE's** behalf any and all documents necessary in **A CORP.'s** judgment to end and cause the discontinuance of **FRANCHISEE's** use of the Trademarks and **A CORP.** is hereby irrevocably appointed and designated as **FRANCHISEE's** attorney-in-fact to do so.

8.3    **NO OTHER NAMES.  FRANCHISEE** shall not display the trademark, service mark, trade name, insignia or logotype of any other person, firm or corporation in connection with the franchise business without the express prior written consent of **A CORP.**

**8.4    CHANGE OF THE TRADEMARKS.**  If it appears to **A CORP.** that any of the names or marks are no longer viable commercially or legally, **A CORP.** has the right to change any of its names or marks to others of similar marketing impact.  In such event, **FRANCHISEE** agrees to cooperate with **A CORP.** in changing all signs, graphics, and supplies, including those painted onto **FRANCHISEE's** vehicles.  **FRANCHISEE** agrees to assume all reasonable costs connected with such changes, and to effectuate such changes within the reasonable time frame established by **A CORP.**

**8.5    TRADEMARK PROSECUTION**

**A.**    In the event that **FRANCHISEE** shall learn that a third party, who not a licensee of **A CORP's** Trademarks or any variation, **FRANCHISEE** shall promptly notify **A CORP** of the facts relating to infringing use.

**B.**    With **A CORP's** permission, **FRANCHISEE** may institute litigation to protect **FRANCHISEE's** interest in the Trademark.  In the event that the **FRANCHISEE** chooses to bring action, and **A CORP,** in its sole discretion, grants permission, **FRANCHISEE** shall be responsible for all costs of litigation and shall have a right to any damages collected for infringing use in **FRANCHISEE's** Territory.

## 9.  TRAINING AND OPERATING ASSISTANCE

**9.1    INITIAL TRAINING PROGRAM.**  **A CORP** shall furnish, and **FRANCHISEE** shall complete to **A CORP's** satisfaction, in its sole discretion exercised in good faith, **A CORP's** training program on the operation of the **A CORP** System franchise.

**A.**    **THE PROGRAM.**    Such training shall consist of 2 days of instruction at **A CORP's** headquarters or at such place or places designated by **A CORP.**  Participation of **FRANCHISEE** in the training program shall be required unless participation is waived by **A Corp** as specified in Section 9.1C below.  If **A CORP** determines that **FRANCHISEE** requires additional training, the **FRANCHISEE** shall attend such additional program at **FRANCHISEE's** own expense.

**B.**    **EXPENSES.**  **FRANCHISEE's** shall be solely responsible for **FRANCHISEE's** own travel, living expenses and salary during the training period.

**C.**    **WAIVER.**    **FRANCHISEE's** participation in the **A CORP** training program, as described in Section 9.1A, may be waived by **A CORP** if **A CORP** determines in its sole discretion that **FRANCHISEE** has sufficient prior business experience to excuse him from participation in **A CORP's** training program.

**9.2    STAFF TRAINING.**    **FRANCHISEE** shall implement a training program for his  other employees, in accordance with the training standards and procedures prescribed by **A CORP.** **FRANCHISEE** shall employ at all times during the term of this Agreement only employees so trained to offer the franchised services.  **FRANCHISEE** alone shall assume all expenses associated with staff training.

**9.3    ADDITIONAL ASSISTANCE.**    **A CORP** shall furnish **FRANCHISEE** with the

following additional operating assistance.

A.  **OPERATIONS MANUAL.**   **A CORP** will provide a copy of its Operations Manual (as defined in Section 12.1), which at all times will remain the property of **A CORP**, for use by **FRANCHISEE** in the operation of the **A CORP's** System franchise.

B.  **GRAND OPENING PROMOTIONAL PROGRAM.**   **A CORP** shall consult with **FRANCHISEE** concerning a grand opening promotional program, which program shall be conducted by **FRANCHISEE** at his or her sole cost and expense.

C.  **ADVERTISING MATERIALS.**   **A CORP** may, from time to time, at its discretion, develop and provide **FRANCHISEE** with the art work for advertising materials to be used by **FRANCHISEE** in the promotion of **FRANCHISEE's  A CORP** System franchise.

D.  **SEMINARS.   A CORP** may from time to time, at its sole discretion, conduct refresher training seminars for the purpose of informing franchisee's of new developments and improvements in the Business System relating to various aspects of the franchise operations, including new product lines and profit centers, new marketing techniques, and revised operational and management standards and techniques.  Unless otherwise approve in writing by **A CORP,  A CORP** shall have the right to require **FRANCHISEE** to attend at least 1 such seminar or a regional meeting during each year of this Agreement.  There shall be no additional charge for such seminars or meetings,  but all travel and living costs incurred by **FRANCHISEE** shall be borne by **FRANCHISEE.**

E.  **ON-GOING ASSISTANCE AND SUPERVISION.   A CORP** shall furnish to **FRANCHISEE** from time to time such operating assistance and training, as is, in **A CORP's** sole discretion, reasonably necessary.  Operating assistance and training may include, by way of illustration, advice and guidance with respect to modifications or additions in the Business System, new marketing programs, the establishment of administrative, bookkeeping, accounting and general operating procedures, and such other advice as shall reasonably pertain to the operation of the franchise.  **A CORP** retains the right to license additional services and programs which **FRANCHISEE** might offer to its customers.

F.  **INITIAL SALES ASSISTANCE.**   Upon **FRANCHISEE's** written request and **A CORP's** consent,    **A CORP** shall furnish, for not less than 2 days during the first weeks of **FRANCHISEE's** operations, a representative to train and assist **FRANCHISEE** and his sales staff by calling on prospective customers within the Territory.  **A CORP** shall require a reasonable fee for providing such initial sales assistance.  Such fee shall include, without limitation, all expenses incurred by **A CORP** in providing initial sales assistance.

G.  **A CORP** presently offers products through **A CORP's** affiliate, **Rooter-Man Corp.,** which is a supplier and distributor of various tools and supplies needed in the operation of a **Rooter-Man** franchise.  These tools and supplies consist of drain cleaning machines, cables, cutters, various hand tools, drain cleaning products, logo patches, truck decals, and other such items. **FRANCHISEES** are not required to purchase these or any items from the **Rooter-Man Corp.** nor is **A CORP** or the **Rooter-Man Corp.** required to continue supplying, selling or distributing these or any items.

10.  **FRANCHISE OFFICE LOCATION.**   Since the location of **FRANCHISEE's** office is not an important aspect of the operation of the **A CORP** System franchise,  **FRANCHISEE** shall only be obligated to secure an adequate facility to house **FRANCHISEE's** vehicles, equipment and supplies.

Such facility must be located within the Territory and such facility shall comply with all local, state and federal regulations as well as A CORP's Operations Manual. Specifically, but without limitation, such facility shall be maintained by **FRANCHISEE** in strict compliance with all local, state and federal regulations pertaining to the storage of hazardous and non-hazardous chemicals.

## 11. VEHICLES, EQUIPMENT AND UNIFORMS

11.1 **VEHICLES**. Prior to the commencement of business by **FRANCHISEE, FRANCHISEE** shall purchase or lease the number and variety of vehicles to be used in the operation of the **A CORP.** System franchise as reasonably prescribed by **A CORP.** All vehicles must meet **A CORP.**'s requirements for appearance, color and other appropriate specifications and must be fully equipped as required by the Operations Manual. **FRANCHISEE** expressly agrees to display all Trademarks required by **A CORP.** on such vehicles. All vehicles must be maintained in sound physical condition and the appearance of such vehicles must be well maintained at all times in order to uphold the integrity of the Trademarks. **FRANCHISEE** shall promptly, upon request, provide **A CORP.** with photographs, copies of invoices and other evidence satisfactory to **A CORP.**, confirming that such vehicles conform to **A CORP.**'s specifications.

11.2 **EQUIPMENT**. Prior to the commencement of the business, **FRANCHISEE** shall at its sole cost and expense lease or purchase, all of the tools, equipment, uniforms, drain cleaning products, supplies, computer equipment, software, forms and other equipment and materials recommended by **A CORP.**, but purchased from suppliers of **FRANCHISEE's** choice.

11.3 **UNIFORMS**. In order to present a neat and clean appearance while performing the services of the **A CORP.** System franchise, **FRANCHISEE** and each employee of **FRANCHISEE** shall wear a uniform approved by **A CORP.**

## 12. OPERATION OF THE FRANCHISE

12.1 **OPERATIONS MANUAL**. **FRANCHISEE** acknowledges that nationwide uniform standards of service are vital to the protection of the **A CORP.** System and the Trademarks, and are necessary to ensure that the public receives the quality of service associated with the **A CORP.** System and the Trademarks. **FRANCHISEE** therefore agrees that in order to protect the reputation and the goodwill associated with the Trademarks, and to maintain the uniform standards of operation by all **A CORP.** System franchisees, **FRANCHISEE** shall conduct the franchise in strict accordance with **A CORP.**'s proprietary Operations Manual (the "Operations Manual").

A. **INCORPORATION OF OPERATIONS MANUAL**. The Operations Manual is intended to further the purposes of this Agreement, and is specifically incorporated into this Agreement.

B. **CONFIDENTIALITY OF OPERATIONS MANUAL**. **FRANCHISEE** shall at all times treat as confidential and shall not at any time disclose, copy, duplicate, record or otherwise reproduce in whole or in part, or otherwise make available to an unauthorized person or persons, the contents of the Operations Manual. The Operations Manual, including all new updated and old superseded pages, shall at all times remain the sole property of **A CORP.** **A CORP.** shall amend and update the Operations Manual and shall provide such updated version to **FRANCHISEE** at no cost to **FRANCHISEE**. **FRANCHISEE** agrees to insert all

new pages immediately in their proper places and to remove completely the superseded pages at the same time for return to **A CORP. FRANCHISEE** shall promptly return the Operations Manual upon the expiration or other termination of this Agreement.

C. **MODIFICATIONS. FRANCHISEE** recognizes and agrees that **A CORP.** may from time to time change or modify its standards of operation, including the adoption of new procedures and programs, as outlined in the Operations Manual. **FRANCHISEE** shall accept and conform to such changes or modifications, and shall make all reasonable expenditures necessitated by the changes or modifications, within the time periods reasonably established by **A CORP.**

**12.2 HOURS OF OPERATION. FRANCHISEE** shall provide prompt and courteous service at all times during normal working hours and shall provide emergency service that will adequately meet the needs of customers for such service within the Licensed Territory. During customary business hours, **FRANCHISEE** agrees to have its telephone(s) answered by a trained employee. **FRANCHISEE** agrees to use a telephone answering service only after customary business hours.

**12.3 RESOLUTION OF CUSTOMER PROBLEMS. FRANCHISEE** and his employees shall provide prompt, competent and courteous service to customers. **FRANCHISEE** shall respond to any dissatisfied customers within 24 hours after the complaint is received, whenever possible.

**12.4 DRAIN CLEANING PRODUCTS AND OTHER SUPPLIES. FRANCHISEE** shall utilize only those drain cleaning products and other supplies, including forms, authorized by **A CORP.**

**12.5 FRANCHISEE MANAGEMENT. FRANCHISEE** shall at all times during the term of this Agreement operate the **A CORP.** System franchise on a full-time basis or employ on a full-time basis at least one trained individual. **FRANCHISEE** or such individual shall devote his entire time during normal business hours, as defined in the Operations Manual, to the management, operation and development of **FRANCHISEE's A CORP.** System franchise. The individual managing the franchise shall not engage in any other business or investment requiring active participation during normal business hours. **A CORP.** has entered into this Agreement in reliance upon the representation of **FRANCHISEE** that during the term of the Agreement, the individuals named in Section 1.14 will be the owners who are in active, full-time charge of **FRANCHISEE's** franchise and who are responsible for adhering to the terms of this Agreement.

**12.6 INSURANCE.** It is understood and agreed that the protection of the goodwill of the **A CORP.** system, Trademarks and the financial security of both **FRANCHISEE** and **A CORP.** requires the existence of public liability insurance coverage for **FRANCHISEE**. **FRANCHISEE** shall procure and maintain in full force and effect Commercial General Liability insurance coverage (including premises/operations coverage, product liability coverage, completed operations coverage and contractual liability coverage) and comprehensive motor vehicle liability insurance coverage (including hired and non-owned motor vehicle coverage) in the name of **FRANCHISEE**, with **A CORP.** named as an additional insured, at **FRANCHISEE's** sole cost and expense. The insurance coverage shall be in the following minimum amounts:

1. Bodily Injury                                        $1,000,000.00    Each person

|  | $1,000,000.00 | Each occurrence |
| --- | --- | --- |
| 2. Property damage | $500,000.00 | Each occurrence |
| 3. Workers' Compensation coverage |  | As required by law |

As an alternative to the foregoing, **FRANCHISEE** may obtain a single limit policy in the amount of no less than $1,000,000.00.

A. **NOTICE.**   All insurance purchased by **FRANCHISEE** shall provide that **A CORP.** be given at least 30 days prior written notice of any termination, amendment, cancellation or modification.  **FRANCHISEE** shall promptly provide **A CORP.** with certificates of insurance evidencing such coverage no later than 14 days prior to the date that **FRANCHISEE** shall be open for business to the public, as well as annual certificates throughout the term of the franchise evidencing continuing coverage.

B. **INSURANCE AND STEP-IN-RIGHTS.**   If **FRANCHISEE** fails or refuses to purchase insurance conforming to the standards and limits prescribed in Section 12.5, **FRANCHISEE** shall be in default of this Agreement as set forth in Section 15.2A and E.

12.7    **BOOKEEPING STANDARDS.  FRANCHISEE,** all financial statements prepared by or for **FRANCHISEE**, and all reports submitted by **FRANCHISEE** shall conform to the current standards and requirements as described in the Operations Manual. All such bookkeeping and accounting records and financial statements, for such periods as may from time to time be prescribed in the Operations Manual, shall be made available for inspection by **A CORP.** during normal business hours.

12.8    **FRANCHISOR INSPECTION.  A CORP.** shall have the right from time to time, and without prior notice to **FRANCHISEE** to send representatives to **FRANCHISEE'S** office in order to inspect **FRANCHISEE's** operations and records and to determine the faithfulness of **FRANCHISEE's** compliance with the provisions of this Agreement and the Operations Manual.

12.9    **COMPLIANCE WITH LAW. FRANCHISEE** shall operate his **A CORP.** System franchise in strict compliance with applicable laws, rules and regulations of all governmental authorities. **FRANCHISEE** shall comply with all applicable laws and regulations of the federal, state or local governments, and shall prepare and file all necessary tax returns, and pay promptly all taxes imposed upon **FRANCHISEE** and upon **FRANCHISEE's** franchised business.  **FRANCHISEE** may be required to be licensed for some or all of the components of the **A CORP.** System and is solely responsible for securing and maintaining such licenses

12.10   **NO SUGGESTED SERVICE FEES.  FRANCHISEE** acknowledges that any and all service fees included in the Operations Manual or other operating memoranda, are intended by **A CORP.**  to be illustrative only and are not intended to be suggestive of fees to be charged by **FRANCHISEE** for particular services.  **FRANCHISEE** further acknowledges that **A CORP.** does not set or enforce a fee schedule of any type. **FRANCHISEE**, in its sole discretion, shall determine the fees to be charged for licensed services performed under the **A CORP.** System.

12.11   **FRANCHISEE TELEPHONE SERVICE AND DIRECTORY  LISTINGS.**
**FRANCHISEE** shall at its sole expense maintain telephone service for the franchise and shall have all of **FRANCHISEE's** telephone numbers continuously listed and advertised in those "white pages" and "yellow page" directories which are usually and customarily

distributed within the Licensed Territory, as **A CORP**. may designate or approve. All such listings shall be in the manner, style and type size and shall contain all other characteristics as **A CORP**. may designate in the Operations Manual or in operating memoranda. In all advertising placed by **FRANCHISEE** in which such listed numbers appear, there shall not appear any other telephone numbers subscribed for by **FRANCHISEE** for personal use or for the conduct of any other business. **FRANCHISEE** shall not, without **A CORP**.'s express written consent, cause or allow itself to be listed in any directories outside of the Territory. **A CORP**. shall have the right to recommend the type of telephone service, the number of telephone lines, and all matters related to the telephone service for the franchise, and **FRANCHISEE** shall promptly comply with all specifications and directives of **A CORP**. as established or modified from time to time. **FRANCHISEE** hereby irrevocably appoints **A CORP**. as its Attorney-in-Fact to assign all such telephone numbers to **A CORP**. and expressly authorizes the applicable telephone company to make such assignment upon termination or expiration of this Franchise Agreement. **FRANCHISEE** agrees to indemnify **A CORP**. as specified in Section 19.9.

## 13.   RECORDS.

**13.1**   **SALES RECORDS AND TAX RETURNS. FRANCHISEE** shall record all sales and shall keep and maintain accurate records. **FRANCHISEE** shall provide **A CORP**. annually with copies of federal, state and local (if applicable) income tax returns.

**13.2**   **PERIODIC REPORTS.** In order to assist and advise **FRANCHISEE** with respect to the operation of his business, **A CORP**. shall, at its sole discretion, require **FRANCHISEE** to furnish **A CORP**. within 15 days after the expiration of each calendar month with a profit and loss statement of the Franchise for the preceding calendar month. All such financial statements shall be prepared in accordance with the format established by **A CORP**. in the Operations Manual, and shall be certified by **FRANCHISEE** or in the case of a corporate **FRANCHISEE**, by **FRANCHISEE**'s chief executive officer or chief financial officer, as being true and correct and as being prepared in accordance with generally accepted accounting principles consistently applied from applicable period to period. In addition, within 90 days after the end of each calendar year, **FRANCHISEE** shall furnish **A CORP**. with an annual balance sheet, profit and loss statement and statement of changes in financial position, which have been certified as correct by **FRANCHISEE** and which have been prepared by an independent accountant. **A CORP**. agrees to maintain in confidence **FRANCHISEE**'s financial information and shall not disclose **FRANCHISEE**'s identity in connection with **FRANCHISEE**'s financial information.

**13.3**   **ADDITIONAL RECORDING SYSTEMS. FRANCHISEE** agrees to furnish to **A CORP**. all other information pertaining to the franchised business and clientele through the system developed by **A CORP**. or as **A CORP**. may, from time to time, specify in the Operations Manual. **A CORP**. shall be granted full and complete access to all records and information created by such system, including without limitation, by direct telephone, the Internet or other data communications links.

**13.4**   **INSPECTION AND AUDIT. FRANCHISEE** shall keep and preserve for 5 years all business records, including ledgers, credit card statements and other tax returns, bank statements, duplicate deposit slips and other evidence of gross revenues and business transactions for each such year. **A CORP**. shall have the right at any time during regular business hours to enter **FRANCHISEE**'s premises to inspect, audit and make copies of any

books of accounts, bank statements, documents, records, tax returns, papers and files of **FRANCHISEE** relating to gross revenues and business transactions. Upon the request by **A CORP.**, **FRANCHISEE** shall make any such material available for inspection at **FRANCHISEE's** premises and **FRANCHISEE** shall allow **A CORP.** and its representatives to remove temporarily **FRANCHISEE's** records solely for copying, review and/or audit purposes. If **A CORP.** determines that there has been an underpayment of fees by **FRANCHISEE, FRANCHISEE** shall pay the amount of understatement plus interest at the rate of 18% per annum and the cost of the audit.

## 14. ASSIGNMENT AND RIGHT OF FIRST REFUSAL

**14.1** **ASSIGNMENT BY A CORP.** **A CORP.** may freely transfer or assign its rights and obligations under this Agreement to any person, corporation or other entity. Such transfer or assignment shall be binding upon and inure to the benefit of **A CORP.**, its successors and assigns.

**14.2** **ASSIGNMENT BY FRANCHISEE.** **FRANCHISEE** acknowledges that the rights provided for in this Agreement are personal to **FRANCHISEE** and that this franchise has been granted by **A CORP.** in reliance upon the particular skills, knowledge and business ability of **FRANCHISEE**. **FRANCHISEE** agrees that he shall not sell, assign, transfer, give, mortgage, pledge or otherwise encumber any interest in the assets of the franchise or **FRANCHISEE** collectively referred to herein as a "transfer" except as permitted herein. Any sale, assignment, transfer or encumbrance of this Agreement, of any of the rights granted under this Agreement, or in the ownership of the **FRANCHISE**, which is not in accordance with the terms and conditions provided in this Section 14.2 shall constitute a breach of this Agreement and shall permit **A CORP.** to terminate this Agreement immediately as provided for in Section 15.1 of this Agreement.

**A.** **PERMITTED TRANSFERS.** **A CORP.** shall not unreasonably withhold its consent to a Transfer of any interest of **FRANCHISEE** or the franchise, but shall, as a condition precedent to such consent, require that:

1. **FRANCHISEE** first offers to sell such interest to **A CORP.** at the same price and on the same terms and conditions as it proposes to sell such interest to a third party. **FRANCHISEE** shall furnish a signed and notarized copy of the third party's offer to purchase. **A CORP.** shall have 30 days after receipt of such bona fide offer in which to exercise its right of first refusal. The failure by **A CORP.** to exercise its option shall in no way be construed to affect **A CORP.**'s decision to approve a proposed transferee. If **A CORP.** fails to exercise its option and the Franchise is not subsequently sold to the proposed transferee for any reason, **A CORP.** shall continue to have, upon the same conditions, a first option to purchase the Franchise upon the terms and conditions of a subsequent offer. **A CORP.** shall have 30 additional days following **A CORP.**'s rejection of its right of first refusal to review the Transfer, based upon the qualifications set forth in Section 14.2A (4).

2. All monetary obligations of **FRANCHISEE** to **A CORP.** as of the proposed date of the Transfer have been or will be paid as of such date.

3. By the closing date for said transfer, **FRANCHISEE** shall have executed a general release under seal, in a form satisfactory to **A CORP.**, of all claims against **A CORP.**, its

stockholders, directors, officers, employees and assigns.

4.  The transferee, in the reasonable judgment of **A CORP.**, has the financial resources, relevant work experience, character and ability to conduct successfully the business of the Franchise.  The transferee shall fully disclose its financial position and obligations and other background information prior to any such Transfer.

5.  The transferee shall execute **A CORP.**'s then current Franchise Agreement and related documents to govern the remaining term of the Franchise, including a copy of the Guaranty to this Agreement executed by each shareholder of the transferee, if the transferee is a corporation.

6.  **FRANCHISEE** shall pay to **A CORP.** the Transfer Fee as set forth in Section 1.12; unless the transfer is to an immediate family member of **FRANCHISEE** (i.e., spouse, children or parents only); and

7.  The transferee shall complete **A CORP.**'s training programs in the manner then required of new franchisees, and shall pay **A CORP.** the then required fee, unless **A CORP.** shall waive **FRANCHISEE**'s participation in the training program as specified in Section 9.1C.

B.  **TRANSFER UPON DEATH OR PERMANENT INCAPACITY.**  Immediately upon the death or permanent incapacity of **FRANCHISEE** or if **FRANCHISEE** is a corporation, upon its dissolution or upon the death of any person with a substantial or controlling interest in the Franchise, if requested by **FRANCHISEE**'s heirs, **A CORP.** or its agent, at its sole discretion shall be entitled to assume the operation of the Franchise in accordance with Section 17.  As soon as possible thereafter, and in any event within a reasonable time, the executor, administrator, trustee or other representative of such person or entity shall transfer such interest to the heirs or beneficiaries or to a third party in accordance  with Section 14.2 A above.  **A CORP.**'s right to assume the operation of the Franchise shall continue until the Franchise has been transferred to an accepted transferee as provided in Section 14.2.  **FRAN-CHISEE** shall reimburse **A CORP.** for **A CORP.**'s reasonable expenses in connection with this subsection, including reasonable attorney's fees, and **A CORP.** shall receive the Transfer Fee (as specified in Section 1.12).  However, if a franchise is transferred to a party who is a member of **Franchisee**'s immediate family, (i.e., spouse, children or parents only) who will continue the operation of the franchise under the terms of this Agreement, then no transfer fee shall be required.  Permanent incapacity shall mean that **FRANCHISEE** cannot perform his duties under this Agreement for a period of 6 months or longer.

C.  **TRANSFER TO FRANCHISEE'S CORPORATION.**   If the proposed Transfer is to a corporation at least 75% percent of the stock of which is owned by **FRANCHISEE**, then **A CORP.** shall approve such Transfer provided that the transferee corporation meets the following requirements:

1.  The Corporate charter and by-laws shall provide that its activities are limited to the operation of the Franchise.  Copies of the charter, by-laws, any other agreements af-fecting stockholder rights, such as stock restriction agreements, and resolutions au-thorizing execution of this Agreement shall be delivered to **A CORP.** prior to execution of this Agreement, or when otherwise requested in writing by **A CORP.**

2.  The ownership of the stock of such corporation shall be disclosed in writing prior to the

execution of this Agreement and the charter and by-laws shall reflect that no stock shall be sold, transferred, pledged or otherwise similarly affected without compliance with this Agreement.

3. Each stock certificate shall bear the following legend: "THE TRANSFER OF THE SHARES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN FRANCHISE AGREEMENT BETWEEN THE CORPORATION AND **A CORP.** REFERENCE IS MADE TO SUCH FRANCHISE AGREEMENT AND TO RESTRICTIVE PROVISIONS IN THE CHARTER OF THIS CORPORA TION."

4. The principal stockholders of **FRANCHISEE**, as determined by **A CORP.**, shall personally guarantee the payment and performance of all obligations of **FRANCHISEE** under this Agreement, and shall execute such documents as **A CORP.** may reasonably require to reflect such guaranty; and

5. In addition, **FRANCHISEE** must serve as the principal executive officer of the transferee corporation, all other shareholders of the transferee must meet the requirements of **A CORP.** and the transferee corporation must execute a new Franchise Agreement for the duration of the term, using **A CORP.**'s then current agreement. All acts and the delivery of all documents shall take place before the Transfer. Transfer to A **CORPORATION** shall be approved in a prior writing by **A CORP. FRANCHISEE** shall reimburse **A CORP.** for **A CORP.**'s reasonable expenses in connection with this section, including reasonable attorney's fees.

D. **NON-WAIVER OF CLAIMS. A CORP.**'s consent to a transfer of any interest in the Franchise granted herein shall not constitute a waiver of any claims that it may have against **FRANCHISEE** or against any guarantor of this Agreement.

## 15. DEFAULT AND TERMINATION

15.1 **IMMEDIATE TERMINATION. FRANCHISEE** acknowledges that the occurrence of one or more of the following events would cause harm to the franchise system and thereby lessen its value. **FRANCHISEE** agrees that **A CORP.** shall have the right upon the occurrence of one of the following events to terminate this Agreement immediately upon notice:

A. If **FRANCHISEE** becomes insolvent or surrenders substantial control of the franchised business or a major portion of its assets by virtue of a voluntary or involuntary proceeding in bankruptcy or receivership, or by assignment for the benefit of creditors, or in the event of a similar circumstance or legal process, and such proceeding is not terminated within 30 days;

B. If **FRANCHISEE** attempts to sell, assign, transfer, give, mortgage, pledge or otherwise encumber any interest in, or substantially all of the assets of the Franchise or FRANCHISEE except as permitted by Section 14.2;

C. If **FRANCHISEE** shall violate any provision of the Non-Competition Covenant contained in Section 18. 1;

D. If **FRANCHISEE** shall violate any provision of the Non-Disclosure Covenant contained

in Section 18.2;

**E.** **If FRANCHISEE** makes any material misrepresentations relating to the acquisition of the Franchised Business;

**F.** **If FRANCHISEE** is convicted of a felony, a crime involving moral turpitude, or any other crime or offense that A CORP. believes is reasonably likely to have an adverse effect upon the Franchise, the Trademarks and their associated goodwill, or the A CORP. System; or

**G.** **If FRANCHISEE** fails, for a period of 30 days after having received notification of noncompliance from A CORP. or any governmental or quasi -governmental agency or authority, to comply with any Federal, State or Local law or regulation applicable to the operation of the Franchised Business.

**15.2** **TERMINATION WITH NOTICE. FRANCHISEE** acknowledges that the occurrence of one or more of the events specified in this Section 15.2 would cause harm to the franchise system and thereby lessen its value. Therefore, **FRANCHISEE** agrees that **A CORP.**, in addition to all other remedies at law or in equity, may terminate this Agreement if **FRANCHISEE** shall become in default of any provision of this Section 15.2 or any other provision of this Agreement, and if **FRANCHISEE** shall not cure such default within 30 calendar days for nonpayment of monies, or for other defaults after receipt of a written notice to cure from **A CORP.**, or for a longer period if so mandated by the laws of the state in which **FRANCHISEE** operates. In the event **FRANCHISEE** is in default of this Agreement within 12 months after a prior default (even if cured), and **A CORP.** has served **FRANCHISEE** with a Notice to Cure with respect to such prior default, upon notice, **A CORP.** may terminate this Agreement upon the occurrence of such subsequent default. **A CORP.** need not allow **FRANCHISEE** the opportunity to cure such subsequent default. In addition to the foregoing, **A CORP.** may, at its option, exercise its Step-In-Rights (as specified in Section 17) in the event of any default contained in this Section 15.2.

**FRANCHISEE** shall become in default under this Agreement:

**A.** **If FRANCHISEE** fails, refuses or neglects to pay promptly all monies owing to **A CORP.** on the date due;

**B.** **If FRANCHISEE** fails, refuses or neglects to pay promptly all monies owing to other Franchisees under any Interterritorial Agreement (as specified in Section 7.2) on the date due;

**C.** **If FRANCHISEE** fails, refuses or neglects to pay promptly all monies owing to other creditors on the date due;

**D.** **If FRANCHISEE** fails to submit reports or financial data which **A CORP.** requires under this Agreement, including but not limited to those specified in Section 13;

**E.** **If FRANCHISEE** fails to obtain and maintain in effect the minimum insurance requirements specified in Section 12.6;

**F.** Upon the closing of **FRANCHISEE's** operations for a period of 10 or more consecutive days without the prior written approval of **A CORP.**;

    **G.**    If **FRANCHISEE** fails to submit to binding arbitration of disputes as specified in Section 19.7;

    **H.**    If **FRANCHISEE** changes any aspect of the **A CORP.** system or offers any service or product which has not been approved in a prior writing by **A CORP.**;

    **I.**    **IF FRANCHISEE** fails to diligently, faithfully and in a business like manor, promote, market and conduct the Franchised Business within the Territory as specified in Section 3. 1B; or

    **J.**    If **FRANCHISEE** fails to comply with any of the duties imposed by this Agreement, the Operations Manual or other operations memoranda issued by **A CORP.** including, without limitation, the failure to cure an operational problem.

**15.3**    **CONFORMITY WITH LAW.** Notwithstanding anything to the contrary contained in this Section, in the event any valid, applicable law or regulation of a competent governmental authority having jurisdiction over this Franchise and the parties shall limit A CORP.'s rights of termination or shall require longer notice periods than those set forth above, this Agreement shall be deemed amended to conform to the minimum notice periods required by such laws and regulations. **A CORP.** shall not, however, be precluded from contesting the validity, enforceability or application of such laws or regulations in any action, hearing or dispute relating to this Agreement or its termination.

    **A.**    **FRANCHISEE** Shall be solely responsible for the conduct of its business and for compliance with all the laws, statutes, ordinances, orders or codes of any public or governmental authority pertaining to **FRANCHISEE** and its business operated pursuant hereto and for the payment of all taxes, permits, licenses and registration fees and other charges or assessments arising out of the establishment and operation of **FRANCHISEE'S** business.

**15.4**    **CROSS DEFAULT. If FRANCHISEE** shall be in default of any other agreement between A **CORP.** or its affiliated companies including, without limitation, any Promissory Note, then **FRANCHISEE** shall be deemed in default of this Agreement.

**15.5**    **FRANCHISEE TERMINATION OPTION. FRANCHISEE** shall have the option to terminate this Agreement, only during the initial five (5) year term, subject to adherence to the following terms and conditions:

    **A.**    **FRANCHISEE** shall notify **A CORP.** in writing of his intent to terminate the Agreement no later than 90 days prior to the closing date for placement of advertisements in the yellow page book or books distributed in **FRANCHISEE**'s Territory. If **FRANCHISEE** fails to notify A **CORP.** on or before such 90 day period commences, then **A CORP.** shall exercise its right pursuant to the Power of Attorney, Exhibit B, to retain all of **FRANCHISEE**'s operating telephone numbers.

    **B.**    **FRANCHISEE** shall pay in full all outstanding monies due to **A CORP.**, and shall as well pay a one-time Franchisee Termination Fee as specified in Section 1. 14 herein.

    **C.**    **FRANCHISEE** shall de-identify all aspects of **FRANCHISEE**'s business operation, including without limitation all forms of advertisements, all vehicle displays, and all invoices,

business cards and forms, and shall choose a trade name or trade names which shall not be confusingly similar to **A CORP's** Trademarks or which might give the general public the impression that **FRANCHISEE** is continuing to operate under the **A CORP.** System. **FRANCHISEE** shall further comply with the terms of Section 16 below.

**D.**   Provided **FRANCHISEE** performs all of the foregoing obligations, **A CORP.** shall agree to waive its rights to enforce the non-competition covenant contained in Section 18.1 and its rights to enforce the Power of Attorney. If **FRANCHISEE** however, fails to perform any of the foregoing obligations or if **FRANCHISEE** attempts to utilize any aspect of **A CORP.'s** Trademarks or System, then **A CORP.** shall retain all rights of enforcement under Section 18.1.

**16.    RIGHTS AND DUTIES OF PARTIES UPON EXPIRATION OR TERMINATION**

Upon termination or expiration of this Agreement, **FRANCHISEE** shall within 30 calendar days:

**A.**   Pay all Continuing Royalty Fees, Advertising Contributions and all other charges or debts owed to **A CORP.**, including the balance due on financing or other extension of credit granted or given by **A CORP** to **FRANCHISEE.**

**B.**   Cease to hold himself or herself out as an **A CORP.** System franchise, cease the use of the Trademarks, logos, designs, materials, methods, promotional materials whether or not furnished by **A CORP.** and all other advertising, including without limitation, all forms of telephone directory advertising, and remove all signs, and Trademarks, in whatever form, from the location of the **A CORP.** office licensed by this Agreement and from all vehicles. FRANCHISEE shall contact the internet service provider or website, which provide internet advertisement services, and request the change or deletion of the Trademarks, logos, and designs from the internet advertisement, listings, or domains and, within 60 days, work to ensure that the change or deletion is completed.

**C.**   Return to **A CORP.** all manuals and printed materials belonging to **A CORP.** or bearing the Trademarks.

**D.**   Except with respect to termination under Section 15.5, at the option of **A CORP.,** **FRANCHISEE** shall:

   **1.**   Remove all equipment, furnishings and printed materials from the office premises; or
   **2.**   Sell such equipment, furnishings and printed materials to **A CORP.** at their then current fair market value, as determined by **A CORP.** In no event shall **A CORP.** be liable for payment to **FRANCHISEE** for intangibles including, without limitation, goodwill;
   **3.**   Assign to **A CORP.** the lease for the franchised premises; and
   **4.**   Execute such documents as **A CORP.** may reasonably require to effectuate termination of the Franchise and **FRANCHISEE's** rights to use the Trademarks and the **A CORP.** System including, without limitation, release documents.

**A CORP.** retains the right to enforce the Power of Attorney executed in conjunction with this agreement.

**17.    STEP-IN-RIGHTS**

17.1 **CAUSE FOR STEP-IN.   A CORP.**, at its sole discretion, may exercise the following Step-In Rights in order to prevent an interruption of the Franchised Business which would cause harm to the franchise system and thereby lessen its value. In the event of **FRANCHISEE's** default (as specified in Section 15 herein) or in the event of the death or permanent incapacity of **FRANCHISEE** (as specified in Section 14.2 B), **FRANCHISEE** authorizes **A CORP.** to operate his franchise for as long as **A CORP.** shall deem necessary and practical or upon transfer to an approved franchisee under Section 14.2. Such Step-In Rights shall be exercised without waiver of any other rights or remedies which **A CORP.** may have under this Agreement.

17.2 **DUTIES OF PARTIES.   A CORP.** shall keep in a separate account all monies   generated by the operation of **FRANCHISEE's** business by **A CORP.**'s representatives. **A CORP.** shall deduct all expenses of the business, including reasonable compensation and expenses for **A CORP.**'s representatives from this separate account. **FRANCHISEE** agrees to indemnify **A CORP.** as specified in Section 19.9.

18.    **NON-COMPETITION AND NON-DISCLOSURE COVENANTS**

18.1 **NON-COMPETITION.   FRANCHISEE** agrees that from the date hereof until 3 years following the termination of the Franchise for whatever reason and expiration, neither **FRANCHISEE** nor any of his family members or its officers, directors, other key personnel, employees or stockholders, if applicable, shall directly or indirectly engage in, hold any interest in, or be involved in any way with any of the services comprising the **A CORP.** System. Such obligation shall apply within the Territory, within 100 miles of the Territory or within 100 miles of any territory covered by another **FRANCHISEE** of **A CORP.** or operated by **A CORP.**'s affiliates. **FRANCHISEE** further agrees that from the date hereof until 3 years following the termination of the Franchise for whatever reason and expiration, **FRANCHISEE** and the persons covered by this section shall not attempt to solicit for employment any person who is, at the time of such solicitation, employed by **A CORP.** or any other franchisee of **A CORP.**, nor induce any such person to leave his or her employment.   **FRANCHISEE** agrees that as a condition of his affiliation with **A CORP.**, its key personnel and stockholders, if applicable, shall execute covenants not to compete embodying these terms on forms provided by **A CORP.** **FRANCHISEE** acknowledges that such prohibitions are necessary to protect **A CORP.**'s trade secrets and to otherwise insure the integrity of the **A CORP.** System and the rights of **A CORP.**'s other franchisees. The amounts of time and distance set forth above may be deemed to be divisible into units of one month and one mile and may be reduced should a court find them to be unreasonable. **A CORP.**, in addition to such other rights it may have, shall have the right to injunctive relief to enforce its rights pursuant to this provision. The violation of this provision during the term of the Agreement shall result in the automatic termination of the franchise as specified in Section 15.1.

18.2    **NON-DISCLOSURE. FRANCHISEE** acknowledges that disclosure of any aspect of the System or duplication or disclosure of this Agreement, or the Operations Manual could substantially harm **A CORP., FRANCHISEE** and other franchisees of **A CORP.** **FRANCHISEE** agrees that at no time during or after the term of this Agreement or early termination for whatever reason will he or she disclose, either orally or in writing or by any other medium, or duplicate or in any way make available the contents of the Operations Manual, this Agreement, any other documents, videotapes, materials, or any trade secrets,

formulas or other aspects of the System to any person, corporation or other entity other than **FRANCHISEE** attorneys, accountants or similar parties. Such persons may have access to such materials only to the extent necessary for the transaction of business by **FRANCHISEE**. No such person shall be permitted to retain any software, materials or copies of or notes concerning any such materials. All of the foregoing shall be returned to **A CORP**. immediately upon termination or expiration of this Agreement. The prohibition of this section applies equally to all stockholders, directors, officers, and employees of **FRANCHISEE**. **A CORP**. shall have the right to injunctive relief to enforce the provisions of this Section. The violation of this provision during the term of the Agreement shall result in the automatic termination of the Franchise, as specified in Section 15. 1.

## 19. GENERAL CONDITIONS AND PROVISIONS

**19.1**  **TITLES FOR CONVENIENCE.** Section and paragraph titles used in this Agreement are for convenience only and are not deemed a part of the text.

**19.2**  **ENTIRE AGREEMENT.** This Agreement, including appendices and attachments, constitutes the entire agreement of the parties (and into which all prior negotiations, commitments, representations and undertakings of the parties with respect to the subject matter are merged) and except as otherwise provided, there are no other oral or written understandings or agreements between the parties relating to the Franchise. Nevertheless, nothing in this Agreement or in any related agreement is intended to disclaim the representation that we have made in the franchise disclosure document.

**19.3**  **AMENDMENT IN WRITING.** No amendment or other modification of this Agreement shall be valid or binding on either party, unless reduced to writing and executed by the parties.

**19.4**  **RELATIONSHIP**
   A. **FRANCHISEE** is an independent contractor and is not the agent, joint venturer, partner or employee of **A CORP**. and, except as expressly provided in this Agreement, **A CORP**. shall not be obligated by any agreements, representations or warranties made by **FRANCHISEE** to any person, nor with respect to any other action of **FRANCHISEE**, nor shall **A CORP**. be obligated for any damages or monetary obligations of any sort to any person whether caused by **FRANCHISEE's** action, failure to act, negligence, or willful conduct.

   B. Except as expressly set forth herein, **A CORP**. does not reserve control over nor take responsibility for the conduct or actions of any of **FRANCHISEE's** owners, directors, or employees, nor shall    **A CORP**. have any control over the employment, discharge, compensation or working conditions of any such owner, director or employee of **FRANCHISEE**.

   C. **FRANCHISEE** shall identify himself in all aspects of his business operation, including on all forms and in all advertisements, as being: "Independently Owned and Operated".

**19.5**  **NO WAIVER.** No waiver by **A CORP**. of any breach or series of breaches or defaults in performance by **FRANCHISEE**, and no failure, refusal or neglect of **A CORP**. to exercise any right, power or option given to it or to insist upon strict compliance with or performance of **FRANCHISEE's** obligations, under this Agreement or the Operations Manual, shall constitute a waiver of any provision of this Agreement or the Operations Manual with respect

to any subsequent breach or a waiver by **A CORP**. of its right at any time thereafter to require exact and strict compliance with the provisions of this Agreement.

19.6 **GOVERNING LAW**. This Agreement shall be governed and construed under and in accordance with the laws of the Commonwealth of Massachusetts. **A CORP** and **FRANCHISEE** agree that any action arising out of or relating to this agreement will be brought by the parties only in a Massachusetts state court of Middlesex County, Massachusetts or the United States District Court for the District of Massachusetts in Boston, Massachusetts. **A CORP** and **FRANCHISEE** hereby consent to the jurisdiction of such Courts and further agree to waive any rights or objections to the jurisdiction or venue of any such actions when filed in such courts.   If any part or provision of this Agreement is held or declared invalid by a court of competent jurisdiction, such holding or declaration shall affect only that particular part or provision of this Agreement and all other parts or provisions of this Agreement shall continue in full force and effect.

19.7 **MEDIATION AND ARBITRATION**. **A CORP**. and **FRANCHISEE** agree as a condition to this Agreement to engage in mediation and arbitration prior to the commencement of any court action, except as set forth in Section 19.7 H.   **FRANCHISEE's** failure to submit to mediation and arbitration, shall be deemed a default under Section 15.2. If **A CORP**. must engage an attorney to enforce its rights under this Agreement, **FRANCHISEE** shall reimburse **A CORP**. for all of its reasonable attorney's fees, court costs and expenses incurred in connection with such legal action.

A. Before the commencement of any arbitration, **FRANCHISEE** and **FRANCHISOR** shall submit to the following mediation process:

1. **FRANCHISEE** shall promptly submit in writing the nature of his grievance with  A CORP.   along with any reasonable suggestions for the dispute's possible resolution;  and

2. Within 30 days, the **FRANCHISEE** shall attend a mediation meeting with **A CORP**.  in Boston, Massachusetts to discuss in detail the dispute and to work towards its possible resolution. **A CORP**. shall select the mediator. **FRANCHISEE** and **A CORP**. shall share equally in the cost of the mediation session.

If the parties are unable to reach an amicable solution, then the dispute shall be submitted to arbitration as described below:

B. Prior to any arbitration proceeding taking place, **A CORP.** and **FRANCHISEE** shall, have the arbitrator conduct, in a separate proceeding prior to the actual arbitration, a preliminary hearing, at which hearing testimony and other evidence may be presented and briefs may be submitted, including without limitation a brief setting forth the then applicable statutory or common law methods of measuring damages in respect to the controversy or claim being arbitrated. These hearings shall be held in Boston, Massachusetts.

C. Except as otherwise set forth in this Agreement, any controversy or claim arising out of or relating to this Agreement, or any breach, including without limitation, any claim that this Agreement or any part, is invalid, illegal or otherwise voidable or void, shall be submitted to arbitration before and in accordance with the arbitration rules of the American Arbitration Association in accordance with its commercial arbitration rules, or any other mutually agreeable arbitration association. **A CORP**. and **FRANCHISEE** agree that arbitration shall be conducted on an individual and not a class-wide basis.

D. If, however, a court of competent jurisdiction determines that any such provisions of this Agreement are unlawful-in any way, such court may modify or interpret such provisions to the minimum extent necessary to have them comply with the law. Notwithstanding any provision of this Agreement by which this Agreement shall be governed by and construed under Massachusetts law, all issues relating to arbitration or the enforcement of this Agreement to arbitrate contained herein shall be governed by the United States Arbitration Act, 9 U.S.C. § I et seq., and the federal common law of arbitration.

E. Judgment upon an arbitration award may be entered in any court having competent jurisdiction and shall be binding, final and non-appealable. Except as provided for in Sections 19.9 and 19. 10,    A CORP. and FRANCHISEE (and their respective owners and guarantors, if applicable) hereby waive to the fullest extent permitted by law, any right to or claim for any punitive or exemplary damages against the other and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damage sustained by it.

F. This arbitration provision shall be deemed to be self-executing and shall remain in full force and effect after expiration or termination of this Agreement. In the event either party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party by default or otherwise notwithstanding said failure to appear. The arbitration proceedings shall take place in Boston, Massachusetts unless otherwise agreed by A CORP. and FRANCHISEE.

G. A CORP. and FRANCHISEE agree that no action (whether for arbitration, damages, injunctive, equitable or other relief, including but not limited to rescission) will be maintained by any party to enforce any liability or obligation of the other party, whether arising from this agreement or otherwise, unless brought before the expiration of the earlier of 1 year after the date of discovery of the facts resulting in such alleged liability or obligation or 2 years after the date of the first act or omission giving rise to such alleged liability or obligation, except that where state or federal law mandates or makes possible by notice or otherwise a shorter period, such shorter period shall apply.

H. The obligation to arbitrate or mediate shall not be binding upon either party with respect to claims relating to A CORP.'s trademarks, service marks, patents or copyrights; request for temporary restraining orders, preliminary injunctions or other procedures in a court of competent jurisdiction to obtain interim relief when deemed necessary by such court to preserve the status quo or prevent irreparable injury pending resolution by arbitration of the actual dispute between the parties.

19.8    **NOTICES.**
All written notices to A CORP. permitted or required to be delivered by the provisions of this Agreement or the Operations Manual shall be deemed so delivered 3 days after being placed in the United States Mail, by Certified Mail, Return Receipt Requested, or by receipted overnight carrier to A CORP., 268 Rangeway Road, P.O. Box 290, N Billerica, Massachusetts 01862, Attn. President or to such other address or addresses as A CORP. shall from time to time designate in the Operations Manual or in writing to FRANCHISEE  at the location described in Section 1.2 above, or to such other address as FRANCHISEE may from time to time designate in writing to A CORP.

19.9    **INDEMNIFICATION.  FRANCHISEE** agrees to hold A CORP. harmless and indemnify

A CORP. and its officers, agents and employees of and from all suits, actions, claims and other proceedings brought by any and all persons or entities as a result of services, representations, conduct or work performed by **FRANCHISEE**, its agents, employees, subcontractors or assigns, or in the event **A CORP**. exercises the Step-In-Rights specified in Section 17. **FRANCHISEE** agrees to pay any and all expenses or fees, including reasonable attorney's fees, incurred by **A CORP**., its affiliates, subsidiaries or agents, resulting from any and all claims brought by or against **FRANCHISEE**, its officers, directors, employees or stockholders.

**FRANCHISEE** shall indemnify and hold **A CORP**. harmless of and from any claim made by any telephone company, telephone directory publisher and other related persons or entities with which **FRANCHISEE** conducts business, including all costs, damages, attorney's fees, expenses and liabilities which may be incurred or sustained in connection with or as a result of any action taken in reliance of Exhibit B, Power of Attorney.

The above indemnification provisions shall not be construed, with regard to a particular claim, to apply to any claim where its operation would be against public policy. It is the intent of the provisions above to permit the maximum indemnification of **A CORP**. by **FRANCHISEE** as permitted by law.

19.10  **LIMITATION OF LIABILITY OF A CORP.**  If **A CORP**. shall be found liable to **FRANCHISEE** for any claim based upon this Agreement, **A CORP**.'s liability shall be limited to the amount of the initial Franchise Fee (specified in Section 1.7 herein) that has actually been paid by **FRANCHISEE** at the time of judgment.

In no event will **A CORP**., any affiliate, agent, or employee of **A CORP**. be liable for any other damages including, but not limited to, loss of business, revenues or profits. **FRANCHISEE** agrees that this limitation of liability will apply to any claim **FRANCHISEE** shall have against **A CORP** limited to, claims based on contract violations, torts (such as negligence) or strict liability.

19.11  **LATE PAYMENT FEES**. If **FRANCHISEE** fails to pay **A CORP**. all or any portion of the Continuing Royalty, or Marketing Fund Contribution or any other obligation due to **A 1CORP**., promptly when due, **FRANCHISEE** shall pay to **A CORP**. a late payment fee equal to 18% per annum of such delinquent payments. Notwithstanding the foregoing, if the amount of the late payment fee shall be greater than any such charge permitted by applicable law, such charge shall be reduced to an amount equal to the maximum lawful charge, it being the intention of the parties that such late charge shall in no event be greater than that permitted by law.

19.12  **SURVIVAL OF COVENANTS.**  The covenants contained in this Agreement which, by their terms, require performance by the parties after the expiration or termination of this Agreement, shall be enforceable notwithstanding the expiration or other termination of this Agreement for any reason whatsoever.

20.  **CAVEAT**

The success of the business venture contemplated to be undertaken by **FRANCHISEE** by virtue of this Agreement is speculative and depends to a large extent upon the ability of **FRANCHISEE** as an independent business person as well as other factors. **A CORP**. does not make any representation or warranty as to the potential success of the business venture contemplated by this

Agreement.

**FRANCHISEE** recognizes and understands that he or she may incur other expenses and/or obligations as part of the initial investment in the franchised business or on an ongoing basis which the terms of this Agreement may not address, and which include without limitation initial equipment and supplies, advertising expenses, telephone, insurance, grand opening promotions and working capital necessary to commence operation.

**FRANCHISEE** acknowledges that he or she has read this Franchise Agreement as well as the Disclosure document, and that he or she has been give the opportunity to clarify provisions that he did not understand and to consult with an attorney or other professional advisor. **FRANCHISEE** represents that he or she understands and agrees to be bound by the terms, conditions and obligations of this Agreement.

**FRANCHISEE** acknowledges that he or she may have to prepare for and pass certain local and state mandated examinations in order to operate the Franchise. **FRANCHISEE** alone shall be responsible for the preparation and successful completion of all examinations.

**FRANCHISEE** acknowledges that he or she has entered into this Agreement after making an independent investigation of **A CORP.**'s operations and not upon a representation by **A CORP.** as to profits which **FRANCHISEE** might expect to realize. **FRANCHISEE** acknowledges that prior to the execution of this Agreement, **FRANCHISEE** has had the opportunity to contact existing franchisees of **A CORP.**

21. **RELEASE**

**FRANCHISEE**, his heirs and assigns, hereby remises, releases and forever discharges **A CORP.**, its affiliated companies, their principals, officers, directors, employees and agents of and from all debts, demands, actions, causes of action, suits, accounts, covenants, contracts, warranties, agreements, damages and any and all claims, demands and liabilities whatsoever of every name and nature, both in law and in equity, which **FRANCHISEE**, his heirs and assigns now have or ever had against **A CORP.**, its affiliated companies, their principals, officers, directors, employees and agents, from the beginning of time until this day.

**IN WITNESS WHEREOF** the parties intending to be bound legally, have fully executed, sealed and delivered this Agreement as of the day and year first above written.

**A CORP., FRANCHISOR**

**A CORP., FRANCHISOR**

_Cupta McClure_  By: _Donald Me Donald_

Witness                     Officer

                            10-1-18
                            Date

_____  By:  **Finish Connection, FRANCHISEE**

Witness

                            _____

                            Officer – Mike Mehenni
                            8-10- 18
                            Date

## APPENDIX 1

The Licensed Territory defined below is granted to **FRANCHISEE** on the condition that **FRANCHISEE** performs the obligations set forth in the Agreement to which this Appendix is attached:

| STATE | COUNTY | CITY/TOWN | ZIP CODES | POPULATION |
|-------|--------|-----------|-----------|------------|
| CA | San Joaquin | French Camp | 95231 | 4,374 |
| CA | San Joaquin | Lathrop | 95330 | 17,853 |
| CA | San Joaquin | Manteca | 95336 | 42,675 |
| CA | San Joaquin | Manteca | 95337 | 31,557 |
| CA | San Joaquin | Ripon | 95366 | 16,575 |
| CA | San Joaquin | Tracy | 95304 | 15,706 |
| CA | San Joaquin | Tracy | 95376 | 49,859 |
| CA | San Joaquin | Tracy | 95377 | 30,902 |
| CA | San Joaquin | Tracy | 95378 | 0 |
| CA | San Joaquin | Tracy | 95391 | 9,959 |
| CA | Alameda | Livermore | 94550 | 46,896 |
| CA | Alameda | Livermore | 94551 | 36,867 |

Total Unit(s)[2] Population: 303,223

Initials: _____
**A CORP**

Date: _10-1-18_

Initials: _____
**FRANCHISEE**

Date: _8-10-18_

Initials: _____
**FRANCHISEE**

Date: _8-10-18_

---

[2] One unit is equal to 125,000 populations.

## EXHIBIT A

## GUARANTY OF PERFORMANCE

The undersigned, who each own 5% or more of **FRANCHISEE**, jointly and severally guaranty the performance of **FRANCHISEE** pursuant to this Franchise Agreement.

By: _____

Date: _____8-10-18_____

By: _____

Date: _____


To Be Executed By Principal Stockholder(s) If Franchisee Is a Corporation.

The undersigned, principal stockholder(s) of the above Franchisee, for value received, hereby Absolutely and unconditionally guarantee(s) full performance and payment when due of all of Franchisee's obligations to A CORP pursuant to the above Agreement.

### XX, FRANCHISEE

By: _____

Date: _____

By: _____

Date: _____



## EXHIBIT B

## POWER OF ATTORNEY

I, **Mike Mehenni**, doing business as **Rooter-Man** or any successor entity, in the City of **Tracy,**

in the County of **San Joaquin,** and in the State of **California,** hereby appoint Donald MacDonald of **A**

**CORP.,** 268 Rangeway Road, P.O. Box 290, North Billerica, MA  01862, or his designated successor, as

my Attorney-In-Fact to act in my capacity to do any and all of the following:

1. To act in my place and stead with any telephone service company and any telephone listing and advertising directory company in order to transfer to **A CORP.** or its designee, all right, title and interest I may have in such telephone numbers or telephone directory listings and advertising relating to any franchise granted to me by **A CORP.** or to direct the telephone service company to disconnect such telephone numbers.

2. To perform all other acts necessary to be done in regard to such powers.

3. To appoint a substitute attorney to perform any of the acts that my attorney by this instrument is authorized to perform, with the right to revoke such appointment of substituted attorney.

   The rights, powers and authority of my Attorney-In-Fact herein granted shall commence and be in full force and effect on **July 30, 2018**, and, in consideration of the franchise granted to me, shall be <u>irrevocable</u>.

This Power of Attorney shall include a full indemnification of **A CORP.** by the signatory below of and from any claim made by any telephone company, telephone directory publisher and other related persons or entities with which **FRANCHISEE** conducts business, including all costs, damages, attorney's fees, expenses or liabilities which may be incurred or sustained in connection with or as a result of any action taken in reliance on this Exhibit B, Power of Attorney.

**A CORP.** shall be entitled to obtain equitable relief to enforce this Power of Attorney.  The signatory below agrees to pay all attorneys' fees and costs incurred in connection with enforcement of this Power of Attorney.

By:    _____

Mike Mehenni     8-10-18

Date:    _____



**EXHIBIT C**

**PROMISSORY NOTE**

$_____                                    _____, 2018

For value received and in consideration of a Franchise Agreement signed between the parties dated

_____, 2018, **FRANCHISEE** promises to pay to the order of **A CORP.** ("Holder") at 268

Rangeway Road, North Billerica, MA  01862  the sum of  _____ ($_____) Dollars plus interest

accruing at the ANNUAL PERCENTAGE RATE (APR) of twelve percent (12%).

The payments shall be made as follows:          (Please refer to loan analysis at Exhibit E.)

| | |
|---|---|
| Principal Amount Financed: | $ |
| Annual Interest: | 12% |
| Duration of Loan: | 5 years |
| Start Date of Loan: | |
| Monthly Payment: | $ |
| Total Number of Payments: | 60 |
| Principal Amount: | $ |
| Finance Charges: | |
| Total Cost: | $ |

In no event shall any monies continue to be owing after          ,2023.  Any unpaid balance may be pre-paid at any time without penalty.

If the note is not paid in full each month when due, if a proceeding in bankruptcy, receivership or insolvency shall be instituted by or against the undersigned, or if the underlying Franchise Agreement for which the parties have entered into this Promissory Note is terminated for any reason, then the entire amount of this note shall become due and payable immediately, and the payment and acceptance of any sum on account of this note shall not be considered a waiver of such right of election.

If the note shall not be paid when due and shall be placed by the Holder in the hands of any agent or attorney for collection through legal proceedings or otherwise, the undersigned will pay to the Holder the costs and reasonable expenses of collection, including without limitation, reasonable attorney's fees.

The undersigned hereby acknowledges receipt of a filled-in copy of this note.

_____                    _____
**A CORP.**                                               **FRANCHISEE**

_____                    _____
Witness                                                    Witness

## EXHIBIT D

## WAIVER OF TRAINING PROGRAM PARTICIPATION

A CORP. has determined that, in its sole discretion, based upon _____'s (hereinafter "FRANCHISEE") prior business experiences, participation by FRANCHISEE in A CORP.'s initial training program is unnecessary.

Thus A CORP. hereby exercises its right under Section 9.1C of the Franchise Agreement to waive FRANCHISEE's participation in A CORP.'s initial training program.

### A CORP., FRANCHISOR

_____          By:    _____
Witness                                  Officer

                                 Date:   _____


### Finish Connection, FRANCHISEE

_____          By:    _____
Witness                                  Mike Mehenni

                                 Date:   _____

**EXHIBIT E**
**AUTHORIZATION TO CHARGE CREDIT CARD OR CHECKING ACCOUNT**

**Franchisee's Information**

Individual / Business Entity Name: _Finish Connection_

Contact Name: _Mike Mehenni_

Contact Phone number: _650-630-2661_

Contact Email Address: _mikeme@finishconnection.com_

Contact Fax Number: _____

**Payment Information:** please choose ONE payment method from the choices below:

1.  **CREDIT CARD**

    Type of Card (MC, Visa): _Visa_

    Cardholder's Name: _Mike Mehenni_

    Card Number: _4427-4270-5526-6920_

    Expiration Date: _02-20_

    Security Number on the back: _576_

    Credit Card Billing Address: _30010 S. MacArthur Dr tracy CA 95377_

2.  **CHECKING ACCOUNT**

    Name of Account Holder: _____

    Name of the Bank: _____

    Account Number: _____

    Routing Number: _____

Authorized Signature: _[signature]_    Date: _8-10-18_

By signing above, I hereby authorize A CORP. to charge the above referenced credit card or checking account automatically for the agreed upon charges including the franchise fees, monthly royalties, renewal fees, and any such other dues pursuant to the signed A CORP. Franchise Agreement. All terms and conditions set forth in the A CORP. Franchise Agreement shall remain in full force and effect.

EXHIBIT B.2

## A CORP.

## ADDENDUM TO
## ROOTER-MAN FRANCHISE AGREEMENT

**EXHIBIT B.2**
**A CORP**
**ADDENDUM TO ROOTER-MAN FRANCHISE AGREEMENT**

**Option to Purchase Additional Franchise Territory**

ADDENDUM TO ROOTER-MAN FRANCHISE AGREEMENT (this "Addendum") entered into this 30th day of **July, 2018,** by and between A Corp, a Massachusetts corporation ("Franchisor") and **Finish Connection** (Franchisee"), with reference to the following facts:

A.    Franchisor and Franchisee have entered into a Franchise Agreement on the date hereof, (the "Franchise Agreement") granting Franchisee the right to operate a "Rooter-Man" plumbing, sewer, drain and pipe cleaning business within a specified territory.

B.    Franchisee desires to obtain the exclusive right to purchase one (1) or more additional franchises ("Additional Units") in the territory or territories hereinafter described, pursuant to a separate franchise agreement to be executed for each such Additional Unit.

C.    Pursuant to the execution of this Addendum and subject to the terms and conditions set forth below, Franchisor grants to Franchisee an exclusive right to operate the Additional Unit(s) in the territory or territories hereinafter described for an 12-month period, effective **July 30, 2018,** thereafter Franchisee will have the option to purchase such Additional Unit(s) pursuant to the terms herein at Paragraph 2.3.

Franchisor is willing to grant such rights upon the terms and subject to the conditions hereinafter set forth:

THEREFORE, it is agreed:

1.    **Relationship to Franchise Agreement**
This Addendum is intended by the parties to amend the Franchise Agreement and is hereby deemed to be a part of the Franchise Agreement, as if set forth in full therein.

With respect to the matters set forth herein, the parties intend this Addendum to supplement the Franchise Agreement.   In the event of any conflict between the terms of this Addendum and the terms of the Franchise Agreement with respect to the matters referred to herein, the terms of the Franchise Agreement shall control.

2.    **Additional Units**
2.1    Development Territories.   Franchisee agrees to operate **Five (5)** Additional Unit(s) in the territory or territories as described in Appendix A with the population for each unit territory ranging from 125,000 to 135,000, inclusive.

2.2    Execution of Individual Franchise Agreements.   For Additional Unit(s), Franchisee shall execute a separate franchise agreement in the form then being offered by Franchisor in the state in which the Additional Unit is to be located (the "Individual Franchise Agreement").

2.3    <u>Franchisee's Request for Individual Franchise Agreement</u>.  Franchisee shall, not less than 60 days nor more than 90 days prior to the applicable deadline:  (i)  request a copy of Franchisor's then current disclosure document and Individual Franchise Agreement, (ii) notify Franchisor of the Area where Franchisee intends to license the Additional Unit(s), and (iii) return the executed Individual Franchise Agreement to Franchisor with a check made payable to Franchisor in the amount of $3,975.00 per Additional Unit.   Provided that Franchisee is not then in default under the Franchise Agreement, this Addendum, or any other agreement now or hereafter entered into between the parties, then upon receipt of the executed Individual Franchise Agreement together with Franchisee's payment of the initial franchise fee Franchisor shall execute and return to Franchisee one (1) copy of the Individual Franchise Agreement.

2.4    <u>Development Schedule</u>.  On or before each option date set forth below, or subject to written extensions signed by both Franchisor and Franchisee, Franchisee shall (1) enter into an Individual Franchise Agreement for Additional remaining Units described in Appendix A, which area shall constitute the "Territory" under the Individual Franchise Agreement, and (2) shall pay to Franchisor the initial franchise fee required per Additional Unit.   Upon execution of the Individual Franchise Agreement and payment of said initial franchise fee, such Territory shall be deemed deleted from Appendix A.

|  |  | Option Date |
|---|---|---|
| First Additional Unit | (Unit 2) | July 31, 2019 |
| Second Additional Unit | (Unit 3) | July 31, 2019 |
| Third Additional Unit | (Unit 4) | July 31, 2019 |
| Fourth Additional Unit | (Unit 5) | July 31, 2019 |
| Fifth Additional Unit | (Unit 6) | July 31, 2019 |

3.    <u>Assignment</u>
3.1    <u>Assignment by Franchisor</u>.  Franchisor shall have the right to assign the Franchise Agreement or this Addendum and all Franchisor's rights and privileges hereunder to any person, firm or corporation; provided that, in respect to any assignment resulting in the subsequent performance by the assignee of the functions of Franchisor, the assignee shall expressly assume and agree to perform such obligations.

3.2    <u>Assignment by Franchisee</u>.      While this Addendum is in effect, Franchisee shall have the right to assign, transfer or sell Franchisee's interest in this Addendum only with Franchisor's prior written consent.   Further, no assignment or transfer of the Franchise Agreement or this Addendum may be made by Franchisee or any successor or assign without a concurrent assignment of both the Addendum and Franchise Agreement to the same assignee. Neither Franchisee or any successor or assign shall pledge, encumber, or otherwise give any third party a security interest in this Addendum in any manner whatsoever.   Any transfer, assignment, sale, pledge, or encumbrance made in violation of this Paragraph 3.2 or the Franchise Agreement shall be null and void and shall thereupon automatically terminate this Addendum which shall thereafter have no further force or effect.

4.    <u>Default and Termination</u>
4.1    <u>Termination by Franchisor</u>.   In addition to the rights of termination expressly provided elsewhere in this Addendum or the Franchise Agreement, this Addendum shall automatically terminate and become null and void in the event that:

    (a)    The Franchise Agreement or any franchise agreement executed pursuant hereto is terminated for any reason;

    (b)    Franchisee shall receive (2) or more notices of default under the Franchise Agreement, or any other franchise agreement or other agreement between the parties hereto, within any twelve (12) month period, whether or not such default is cured;

    (c )    Franchisee fails or refuses to execute any Individual Franchise Agreement and pay the Initial Franchise Fee  by the applicable deadline set forth in paragraph 2.4, subject to written extensions signed by Franchisee and Franchisor.

4.2    Exclusivity.  Franchisor agrees that, through the period ending upon the last deadline set forth in paragraph 2.4, or the termination hereof, whichever occurs first, Franchisor shall not enter into any A Corp/Rooter-Man franchise agreement with any person or entity other than Franchisee for an A Corp/Rooter-Man franchise to be located within any of the areas described hereinafter in Appendix A.

4.3    Effect of Termination on Existing Franchises.   Any franchise(s) with respect to which Franchisee has theretofore entered an Individual Franchise Agreement at the time that this Addendum is terminated shall be governed solely by the terms of each such Individual Franchise Agreement.

The submission of this Addendum does not constitute an offer and this Addendum shall become effective only upon the execution thereof of Franchisor and Franchisee.  This addendum shall not be binding on Franchisor unless and until it shall have been accepted and signed by an authorized officer of Franchisor.   In those states where required by law, this Addendum shall not become effective until and unless Franchisee shall have been furnished by Franchisor such disclosure in written form as may be required under or pursuant to applicable law.

**A Corp, FRANCHISOR**        **Finish Connection, FRANCHISEE**

By:                                By:

Officer                              Officer – Mike Mehenni
Title: CEO                        Title: OWNER
Date:   10-1-18                  Date:   9-10-18

## APPENDIX A

**RESERVED TERRITORY:**

| STATE | COUNTY | TOWNS | ZIP CODE | POPULATION |
|-------|--------|-------|----------|------------|
| CA | Stanislaus | Modesto | 95350 | 51,046 |
| CA | Stanislaus | Modesto | 95351 | 46,458 |
| CA | Stanislaus | Modesto | 95352 | 0 |
| CA | Stanislaus | Modesto | 95353 | 0 |
| CA | Stanislaus | Modesto | 95354 | 25,394 |
| CA | Stanislaus | Modesto | 95355 | 58,311 |
| CA | Stanislaus | Modesto | 95356 | 30,918 |
| CA | Stanislaus | Modesto | 95357 | 11,559 |
| CA | Stanislaus | Modesto | 95358 | 31,668 |
| CA | Stanislaus | Modesto | 95397 | 0 |
| CA | Stanislaus | Salida | 95368 | 13,614 |
| CA | San Joaquin | Stockton | 95201 | 0 |
| CA | San Joaquin | Stockton | 95202 | 6,521 |
| CA | San Joaquin | Stockton | 95203 | 15,696 |
| CA | San Joaquin | Stockton | 95204 | 27,786 |
| CA | San Joaquin | Stockton | 95205 | 38,069 |
| CA | San Joaquin | Stockton | 95206 | 65,004 |
| CA | San Joaquin | Stockton | 95207 | 47,965 |
| CA | San Joaquin | Stockton | 95208 | 0 |
| CA | San Joaquin | Stockton | 95209 | 39,488 |
| CA | San Joaquin | Stockton | 95210 | 39,009 |
| CA | San Joaquin | Stockton | 95211 | 1,545 |
| CA | San Joaquin | Stockton | 95212 | 25,239 |
| CA | San Joaquin | Stockton | 95213 | 0 |
| CA | San Joaquin | Stockton | 95214 | 0 |
| CA | San Joaquin | Stockton | 95215 | 23,224 |
| CA | San Joaquin | Stockton | 95219 | 27,884 |

**TOTAL RESERVED POPULATION:  626,398**

